**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR HOME CARE & HOSPICE, INC.,**<br><br>         Plaintiff,<br><br>    v.<br><br>**SYLVIA MATHEWS BURWELL**, Secretary, U.S. Department of Health and Human Services, <u>et al.</u>,<br><br>         Defendants. | Case No. 14-cv-00950 (CRC) |

## **MEMORANDUM OPINION**

This case requires the Court to interpret what it means to "document" that a meeting took place. Seeking to curb fraudulent Medicare claims, Congress included a provision in the Patient Protection and Affordable Care Act ("ACA") that modified the requirements for Medicare reimbursement for services rendered to homebound patients. Whereas previously, physicians needed only to certify that a patient required home-health services, the new law requires them also to "document" that they have had a "face-to-face encounter" with the patient within a reasonable timeframe. Pursuant to this statutory provision, the Department of Health and Human Services ("HHS") issued a regulation requiring physicians to document that the face-to-face encounter occurred by, among other things, providing an explanation of why the clinical findings made during the encounter support a determination that the patient is homebound and in need of home-health services. This regulation has become known as the "narrative requirement." An insufficient explanation results in a denial of Medicare reimbursement.

Plaintiff National Association for Home Care & Hospice, Inc. ("NAHC")—a trade association that represents some 6,000 home-health agencies—has challenged the narrative requirement under the Administrative Procedure Act ("APA"). NAHC maintains that the rule

exceeds the scope of its authorizing provision in the ACA by requiring doctors to do more than simply attest to the fact that a meeting took place within a certain timeframe.  Invoking the familiar Chevron framework, HHS counters that the meaning of the verb "document" is broad enough to encompass a requirement to "explain," based on findings made at a face-to-face encounter, why the patient qualifies for home-health services, and that its interpretation of the statutory provision is reasonable given Congress's goal of reducing fraud and HHS's expansive authority to administer Medicare programs.  HHS also highlights two alternative statutory provisions that purportedly authorize the narrative requirement.

The Court concludes that HHS's reading of the statute—although not the most natural one—is not foreclosed by its authorizing provision and that it is otherwise reasonable.  A mandate to document that a face-to-face encounter has occurred most readily brings to mind some manner of attestation or certification, serving as proof that the required meeting took place at a particular time and place.  There are, however, other ways in which to "document" that the encounter has occurred, and the statute is silent as to which method of documentation HHS should require—Congress simply has not spoken to the issue.  In an effort to further "Congress'[s] intent for more physician involvement in determining the patient's eligibility" for home-health services, 75 Fed. Reg. 70431, HHS interpreted the statutory provision to require more-comprehensive (and burdensome) documentation in the form of clinical findings and reason-giving.  Congress has not unambiguously foreclosed this interpretation, and HHS has offered a cogent explanation for why its interpretation is reasonable in light of the authorizing provision's purpose.  Because HHS's explanation is entitled to substantial deference, the Court will uphold the challenged regulation.

## I.     Background

The Patient Protection and Affordable Care Act, Pub. L. No. 111–148, 124 Stat. 119 (2010), modified the requirements for a home-care organization to make a claim for Medicare

reimbursement of home-health services. Prior to 2010, a physician was required only to certify that home-health "services are or were required because the individual is or was confined to his home"; that "a plan for furnishing such services to such individual has been established and is periodically reviewed by a physician"; and that "such services are or were furnished while the individual was under the care of a physician." 42 U.S.C. § 1395f(a)(2)(C) (2009).[1] As part of the ACA, Congress added an additional requirement that "prior to making such certification the physician must document that the physician . . . has had a face-to-face encounter . . . with the individual within a reasonable timeframe as determined by the Secretary [of Health and Human Services]." Id. (2010). Neither party disputes that Congress intended the face-to-face-encounter requirement to reduce waste, fraud, and abuse by increasing physician involvement in the eligibility process. Congress has even authorized "[t]he Secretary [to] apply a face-to-face encounter requirement" to other services "based upon a finding that such a decision would reduce the risk of waste, fraud, or abuse." ACA § 6407(c); H.R. 3962, 111th Cong. (2009), 2009 CONG US HR 3962.

As with many new statutory provisions, a regulation soon followed. In 2011, HHS amended its regulation governing home-health-services claims to incorporate the statutory face-to-face-encounter and documentation requirements. The new regulation required:

> The physician responsible for performing the initial certification must document that the face-to-face patient encounter, which is related to the primary reason the patient requires home health services, has occurred no more than 90 days prior to the home health start of care date or within 30 days of the start of the home health care by including the date of the encounter, and including an explanation of why the clinical findings of such encounter support that the patient is homebound and in need of either intermittent skilled nursing services or therapy services.

---

[1] Medicare Part A and Part B list these requirements in separate sections, but their language is identical for purposes of this analysis.

42 C.F.R. § 424.22. HHS refers to this explanation component of its regulation as the "face-to-face narrative requirement." Defs.' Mot. Summ. J. 6.

According to NAHC, which represents home-health agencies adversely affected by the rule, HHS has routinely denied Medicare reimbursement for insufficient explanations, even when the patient has had a face-to-face encounter with a physician and otherwise met the required standards for home-health services. Compl. ¶¶ 34–35, 38. NAHC filed suit against HHS in June 2014, asserting that the narrative requirement violated the authorizing provision of the ACA, the Fifth Amendment, and the APA. Id. ¶¶ 45–58. In November 2014, HHS eliminated the narrative requirement in order "to simplify the face-to-face regulations" and reduce the burden on physicians and home-health agencies. 79 Fed. Reg. 66032 (stating the Final Rule); 79 Fed. Reg. 38376 (explaining why the face-to-face narrative requirement should be eliminated). Yet it continues to apply the requirement to Medicare claims filed before the regulatory change.

In January 2015, the Court dismissed two of NAHC's three counts against HHS for failure to exhaust administrative remedies. Nat'l Ass'n for Home Care & Hospice, Inc. v. Burwell, 77 F. Supp. 3d 103, 106 (D.D.C. 2015). The Court let stand, however, NAHC's claim that the narrative requirement is inconsistent with the ACA, finding that exhaustion would have been futile. Id. HHS has moved for summary judgment on the remaining count. In addition to maintaining that its interpretation was permitted by the statute and that it was reasonable in light of the statute's purpose, HHS offers two other statutory provisions as potential sources of authority for the narrative requirement. Defs.' Mot. Summ. J. at 15. NAHC has also moved for summary judgment on the remaining count, contending that HHS's interpretation is prohibited by the plain language of the statute and is clearly unreasonable. Pl.'s Mem. Supp. Mot. Summ. J. 1.

## II.  Standard of Review

Courts "review 'an agency's construction of [a] statute which it administers' under the familiar principles of Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc." Vill. of Barrington v. Surface Transp. Bd., 636 F.3d 650, 658 (D.C. Cir. 2011).  Under the Chevron framework, courts engage in a two-step inquiry.  First, if "Congress has directly spoken to the precise question at issue . . . the court as well as the agency[] must give effect to the unambiguously expressed intent of Congress."  Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984).  At this first step of the inquiry, courts "employ[] traditional tools of statutory construction," id. n.9, in order "to determine whether Congress has 'unambiguously foreclosed the agency's statutory interpretation,'" Vill. of Barrington, 636 F.3d at 659 (quoting Catawba Cnty. v. EPA, 571 F.3d 20, 35 (D.C. Cir. 2009)).  If Congress has "prescrib[ed] a precise course of conduct other than the one chosen by the agency," or if "the agency has clearly exceeded" the "range of interpretive discretion" afforded it by Congress and put forward an interpretation outside "the statute's clear boundaries[,] then, as Chevron puts it, 'that is the end of the matter'—the agency's interpretation is unlawful."  Id. at 659–60 (quoting Chevron, 467 U.S. at 842).  The Court conducts this first part of the analysis "without showing the agency any special deference."  Id. at 660.

Only if "statutory ambiguity has left the agency with a range of possibilities and . . . the agency's interpretation falls *within* that range . . . will [the agency] have survived Chevron step one."  Id. at 660.  Should an agency survive Chevron step one, a court will proceed to Chevron step two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843.  That is, the court should "defer to the agency's permissible interpretation," so long as "the agency has offered a reasoned explanation for why it chose that interpretation."  Vill. of Barrington, 636 F.3d at 660.  "In addition, the 'tremendous complexity' of the Medicare program enhances the deference due the Secretary's

5

decision." Cmty. Care Found. v. Thompson, 318 F.3d 219, 225 (D.C. Cir. 2003) (quoting Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1229 (D.C. Cir. 1994)).

**III.   Analysis**

    A.   *Chevron* Analysis

        1.   The Parties' Arguments

Under Chevron step one, courts use the traditional tools of statutory construction to determine if the statute "prescribe[s] a precise course of conduct other than the one chosen by the agency, or [grants] the agency a range of interpretive discretion that the agency has clearly exceeded." Vill. of Barrington, 636 F. 3d at 659; see also Chevron, 467 U.S. at 842 ("[T]he [step-one] question is whether Congress has directly spoken to the precise question at issue."). The ACA requires that a physician "document that [he or she] . . . had a face-to-face encounter . . . with the individual [patient] within a reasonable timeframe as determined by the Secretary . . . ." 42 U.S.C. §§ 1395f(a)(2)(C), 1395n(a)(2)(A). HHS interpreted this requirement to mean that the physician must "document that the face-to-face patient encounter . . . has occurred" by, among other things, "including an explanation of why the clinical findings of such encounter support that the patient is homebound and in need of [home-health services]." 42 C.F.R. § 424.22(a)(1)(V).

NAHC contends that the rule is inconsistent with the text, structure, and purpose of the statute and that the statute has therefore unambiguously precluded the interpretation that HHS adopted. Pl.'s Mem. Supp. Mot. Summ. J. 11–18. In NAHC's view, the plain language of the statute requires only that the physician document *that* the encounter occurred, not that the physician explain why the findings from that encounter support the provision of home-health services. Id. at 12 (asserting that the statutory requirement "is not a 'why,' it is a 'what'"). NAHC rests this textual argument in part on the Webster's Dictionary definitions of "document": (1) "to create a record of (something) through writing, film, photography, etc." and (2) "to prove (something) by using

6

usually written evidence." Id.  NAHC also notes that the statute requires the physician only to document that the encounter occurred "within a reasonable timeframe." Id. at 10 (quoting 42 U.S.C. § 1395f(a)(2)(C))  This clause, it argues, limits the documentation requirement to recording *when* the meeting occurred. Id. at 14.

Additionally, NAHC claims that the rule is inconsistent with the statute's structure because the same Medicare provision that imposes the documentation requirement also requires physicians to present a written certification that the patient is in need of home-health services. Id. at 14; 42 U.S.C. § 1395f(a)(2)(C).  In Plaintiff's view, it would make little sense for Congress to allow for the imposition of an additional, narrative requirement when the "stronger program integrity provisions" of certification are already in place. Pl.'s Mem. Supp. Mot. Summ. J. 14–15.  Moreover, separate statutory requirements for hospice care require that physicians have "a face to-face encounter with the individual *to determine continued eligibility of the individual for hospice care*." 42 U.S.C. § 1395f(a)(7)(D)(i) (emphasis added).  This language—missing in the home-health provision—is critical in NAHC's view because it shows that Congress knew how to create a face-to-face encounter requirement "for purposes of establishing Medicare coverage certification accountability" and affirmatively declined to do so for home health services. Pl.'s Mem. Supp. Mot. Summ. J. 15.

As to the overall purpose of the statute, NAHC contends that the ACA's statutory documentation requirement was designed to promote merely *some* form of direct engagement between physicians and patients before initiation of home-health services; it did not require the type of detailed consultation that NAHC claims is required to fulfill HHS's narrative requirement. Id. at 16.  Finally, NAHC argues that Congress's goal of reducing fraud alone would not give HHS license to impose any regulatory requirement it desired, no matter how cumbersome, under the guise of requiring "documentation." Pl.'s Reply 5 (listing lie-detector tests, fingerprints, and "cross

examination by Medicare auditors" as anti-fraud measures that would also be inconsistent with the face-to-face-encounter provision).

HHS counters that the regulation hews to the text, structure, and purpose of the ACA provision. It contends that the meaning of the verb "document" is ambiguous and that "documenting" can also require "explaining" what took place during the encounter and the conclusions drawn from it. Defs.' Reply 4. Because the word is susceptible of multiple definitions, HHS contends, it is irrelevant that HHS declined to follow NAHC's preferred one. Defs.' Reply 5; see also Defs.' Mot. Summ. J. 10–11 ("The Agency could have interpreted the phrase as plaintiff does, but the statute does not unequivocally demand that result.").

In response to NAHC's structural argument that the narrative requirement would be superfluous given the certification requirement, HHS points to "long standing program integrity concerns with physicians rubber-stamping certifications put in front of them by home health agencies." Id. at 8. Given these concerns, Congress may have intended the statutory provision at issue to call for more-thorough documentation. And because Congress did not specify what "document" means, the language of the statute does not foreclose HHS's interpretation of the provision. According to HHS, its interpretation is also reasonable because it furthers Congress's goal of reducing waste, fraud, and abuse, as requiring more content from physicians makes it easier to uncover fraudulent schemes and inefficiencies. Id. at 11.

2.   *Chevron* Step One Analysis

Under Chevron step one, a court asks whether Congress has clearly expressed its intent—or instead whether interpretive ambiguity exists—to determine if the agency's chosen interpretation falls outside the bounds of possible interpretations. Because there are many methods of documenting that a face-to-face encounter has taken place, Congress has not specified which method HHS should require, and HHS has chosen one potential method, the Court concludes that

the statutory provision at issue is ambiguous and that the statute does not foreclose the agency's interpretation.  Thus, HHS's interpretation survives Chevron step one.

NAHC places much weight on its contention that HHS is looking at the word "document" in isolation, instead of as part of the phrase "document *that* the physician . . . has had a face to face encounter."  See Pl.'s Mem. Supp. Mot. Summ. J. 10–14 (emphasis added).  But the distinction does not significantly change the word's scope.  The physician must create a written record, and the record must provide evidence of the meeting.  One could certainly imagine less-onerous documentation that would satisfy the statutory requirement.  For instance, a person could document that a meeting occurred by recording when it happened, or who was there, or simply attesting that it occurred.  But writing a narrative describing what happened at the meeting could accomplish the same goal.  Minutes of a corporate board meeting, for instance, serve not just as documentation of what took place at the meeting, but as documentation that the meeting itself took place.  They provide evidence that a meeting took place and that particular topics were discussed.  Similarly, a physician's discussion of her clinical findings from a face-to-face encounter does not simply document the encounter; it also provides evidence *that the encounter took place* and consequently serves as documentation that the physician has had the encounter required by statute.  The statutory text itself thus does not preclude HHS from asking a physician to document the meeting's occurence by recording and discussing what occurred or what he or she observed at the encounter.

Indeed, one of the dictionary definitions cited by NAHC for the verb "document"—"to prove (something) by using usually written evidence"—actually supports HHS's interpretation in this regard.  Requiring a written explanation of why the physician's clinical observations support that the patient is homebound and in need of home-health services is one way to "require the physician 'to prove by . . . written evidence'"—that is, to document—"that the face-to-face-meeting actually occurred."  Defs.' Reply 5.  As HHS explains, "providing more information better enables

[HHS] to ensure that the required meeting actually took place." Id. at 3. The narrative requirement "helps to assure that the 'face-to-face encounter' that occurred *was the sort of encounter that Congress obviously had in mind*, that is, a meeting directed to determining whether home health services are needed." Defs.' Mot. Summ. J. 14 (emphasis added). Thus, for HHS to assess whether an encounter of that sort occurred, it may need to have the ability to require certain (potentially burdensome) documentation, demonstrating that the physician made clinical findings at that encounter with an eye to the patient's homebound status and need for home-health services.

NAHC counters that Congress did not in fact intend that face-to-face encounters in the home-health-services context be directed at determining whether home-health services are actually needed. NAHC points to a separate provision—42 U.S.C. § 1395f(a)(2)(C)—which sets forth the conditions for Medicare Part A reimbursement of home-health services. That provision requires a patient's physician to certify that the patient requires these services and that the physician has developed and routinely reviews the patient's care plan. NAHC contends that HHS's interpretation of the documentation requirement added by the ACA is duplicative of this certification requirement because it asks the physician to explain in a narrative what she has already been required to certify. See Pl.'s Mem. Supp. Mot. Summ. J. 14–15. But "[g]iven long standing program integrity concerns with physicians rubber-stamping certifications put in front of them by home health agencies," Defs.' Reply 8, the narrative requirement adds an additional layer of accountability and program integrity to the certification process. Requiring physicians to provide explanations as part of their face-to-face-encounter documentation thus does more than duplicate the certification process—it independently helps to "ensur[e] that Medicare reimbursement is available only to patients actually in need of home health services." 77 Fed. Reg. 67108. It also helps to ensure that the statutorily required meeting has taken place, which the certification requirement does not. The narrative requirement is therefore compatible with the certification provisions of Section 1395f(a)(2)(C).

NAHC also contrasts the face-to-face-encounter requirement for reimbursement of home-health services with the face-to-face-encounter requirement for reimbursement of hospice-care expenses—both added through the ACA. To receive reimbursement for hospice care under that provision,

> a hospice physician or nurse practitioner [must have] a face-to-face encounter with the individual *to determine continued eligibility of the individual for hospice care* prior to the 180th-day recertification and each subsequent recertification under subparagraph (A)(ii) and attest[] that such visit took place (in accordance with procedures established by the Secretary).

42 U.S.C. § 1395f(a)(7)(D)(i) (emphasis added). In contrast to the documentation requirement found in the home-care section of the statute, this statutory provision explicitly requires that a meeting occur *for the purpose of* determining patient eligibility and that a physician or nurse attest that the meeting occurred. Especially given that Congress added these two provisions to the Medicare Act through the same amendment, NAHC contends, the more comprehensive hospice-care documentation requirement illustrates that Congress intended the home-care documentation requirement to be limited to establishing only that a meeting *of some kind* took place.

The Court is not persuaded. The hospice-care face-to-face-encounter requirement may be phrased differently from the home-care face-to-face-encounter requirement, but the purpose of mandating a face-to-face encounter in both contexts is clear: to reduce the risk of waste, fraud, and abuse by ensuring that patients seeking those services are truly eligible. As HHS asks, "If that is not the purpose, what is?" Defs.' Reply 7. In NAHC's view, the purpose is merely to "[tie] physician certification to a physician who has had a recent encounter with a patient." Pl.'s Reply 7. This is true as far as it goes, but it misses the larger point: Congress did not intend certifying physicians to have just any type of encounter with patients. Rather, Congress likely intended the encounter itself to relate to and focus on the patient's homebound status and need for home-health services. As a result, it is at least plausible that Congress, "by requiring the physician to document

11

a 'face-to-face encounter,' intended not only for a physician and a patient to meet, but that the meeting be directed to a particular end, namely, determining whether home health care services are needed." Defs.' Mot. Summ. J. 10.  Only by mandating some kind of substantive interaction between physician and patient could Congress achieve the goal it has set for face-to-face encounter requirements: to "reduce the risk of waste, fraud, or abuse" in the Medicare system.  See H.R. 3962, 111th Cong., 1st Session (2009), 2009 CONG US HR 3962 (Oct. 29, 2009).  The narrative requirement, by requiring the physician to explain why the clinical findings from her face-to-face encounter support that the patient is homebound and needs home-health services, is one possible method of ensuring that the right kind of encounter has taken place.

In addition, the hospice-care provision—which NAHC holds up as evidence of Congress's intent in relation to the home-care provision—actually undermines its larger claim.  The provision requires physicians to "*attest*[] that [a face-to-face encounter] took place." 42 U.S.C. §1395f(a)(7)(D)(i) (emphasis added).  In the hospice-care context, therefore, Congress has dictated exactly how a physician should prove to HHS that she has had the required meeting: attestation.  By contrast, no such language appears in the home-care provision.  Congress therefore left open the question of how to document—or prove by way of written evidence—that the required face-to-face encounter occurred, thereby allowing the agency to clear the Chevron step-one hurdle.  To put a slightly different spin on NAHC's argument, Congress knew how to require mere attestation as a form of documentation; it chose to do so for meetings related to hospice-care eligibility but not for those related to home-care eligibility.

Finally, NAHC cites the concededly "sparse" legislative history of the face-to-face-encounter provision as evidence that it is aimed only at "making sure the physician has *some* direct engagement with the patient before initiating health services." Pl.'s Mem. Supp. Mot. Summ. J. 16.  And although HHS now concedes that it "could have interpreted the phrase as [NAHC] does,"

12

Defs.' Mot. Summ. J. 10, nothing in the text of the statute or the legislative history that NAHC cites compels that result. Indeed, the Senate Committee Report on which NAHC relies adds no new information about Congress's intent. It simply reiterates the statutory requirement that "as a condition of payment, physicians must have a face-to-face encounter with the patient before making a referral for home health." S. Comm. on Finance, Chairman's Mark: America's Healthy Future Act of 2009, at 190 (September 22, 2009). It does not specify what the face-to-face encounter should entail or how it should be documented—gaps which HHS sought to fill through imposition of the narrative requirement.[2]

Congress's intent is unclear with regard to how physicians should go about documenting that a face-to-face encounter has taken place—the statute is ambiguous on this point. Applying the usual tools of statutory construction, the Court concludes that an interpretation that requires physicians to document through explanation that they have had an appropriate face-to-face encounter with a patient is not off-limits. The Court holds that Congress has not unambiguously foreclosed HHS's interpretation of the statutory documentation requirement, and therefore HHS has overcome the first step of Chevron.

### 3.   *Chevron* Step Two Analysis

Under Chevron step two, the Court "ask[s] whether the [agency] has reasonably explained how the permissible interpretation it chose is 'rationally related to the goals of' the statute." Vill. of

---

[2] To be clear, contrary to what NAHC appears to contend, the regulatory "documentation requirement" and the "narrative requirement" are not two separate requirements. NAHC describes the challenged regulation as containing (1) a requirement that the physician document that the encounter occurred within a prescribed timeframe, *and* (2) a requirement that the physician provide an explanation based on her clinical findings at the encounter. Pl's. Mem. Supp. Mot. Summ. J. 10. This frame is off-kilter. The regulation directly states that the physician's explanation is to be "includ[ed]" as *part of* the documentation that an appropriate face-to-face encounter has occurred. 42 C.F.R. § 424.22. Thus, HHS promulgated the narrative requirement as a means of—not in addition to—requiring documentation that a meeting took place.

Barrington, 636 F.3d at 665 (quoting AT&T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 388 (1999)). "Unlike [the] Chevron step one analysis, [the Court's] review at this stage is 'highly deferential.'" Id. (quoting Nat'l Rifle Ass'n of Am. v. Reno, 216 F.3d 122, 137 (D.C. Cir. 2000)). This is especially so in challenges to Medicare regulations. See Cmty. Care Found., 318 F.3d at 225 (quoting Methodist Hosp. of Sacramento, 38 F.3d at 1229) ("[T]he 'tremendous complexity' of the Medicare program enhances the deference due the Secretary's decision."). "As is often the case, our review here of [HHS's] interpretation . . . under Chevron Step Two overlaps with our arbitrary and capricious review under 5 U.S.C. § 706(2)(A)." Pharm. Research & Mfrs. of Am. v. FTC, 790 F.3d 198, 204 (D.C. Cir. 2015). For NAHC "to prevail on [its] Chevron step-two claim, [the Court] must find that the [narrative requirement is] 'manifestly contrary to the statute.'" Petit v. U.S. Dep't of Educ., 675 F.3d 769, 785 (D.C. Cir. 2012) (quoting Chevron, 467 U.S. at 844). Because HHS "has offered a reasoned explanation for why it chose [its] interpretation," Vill. of Barrington, 636 F.3d at 660, demonstrating that its interpretation is rationally related to the goals of the statute at issue, HHS's regulation survives step two of the Chevron analysis.

The record in this case strongly supports the conclusion that HHS's interpretation is, at a minimum, rationally related to the goals of statute. As even NAHC recognizes, Congress's goal in mandating face-to-face encounters in the home-health-services context was "to improve program integrity to avoid Medicare paying for services for individuals who were not homebound and in need of skilled care." Pl.'s Reply 10. HHS is in clear agreement that "Congress intended for the face-to-face meeting requirement[] to limit fraud and abuse." Defs.' Mot. Summ. J. 3. Indeed, before it promulgated the challenged rule, HHS stated: "We believe that our proposed documentation requirements meet the Congress'[s] intent for more physician involvement in determining the patient's eligibility and managing the care plan." 75. Fed. Reg. 70431. HHS also expressed its belief "that the face-to-face encounter statutory provision was enacted to strengthen

physician *accountability* in certifying that home health patients meet home health eligibility requirements." 75 Fed. Reg. 43268 (emphasis added). Especially in light of the substantial deference owed to HHS at this step of the analysis, the Court agrees that the agency arrived at a reasonable interpretation that fits with the goals of the statute's documentation requirement.

To these ends, HHS required that physicians explain how their clinical findings from the face-to-face encounter support the eligibility requirements that a patient be homebound and in need of home-health services. Requiring an explanation as part of the face-to-face-encounter documentation strikes the Court as a reasonable way to verify that an appropriate encounter has actually taken place. As HHS asserted in publishing the final rule,

> We continue to believe that it is essential for the encounter to be related to the reason the patient comes to need home care. Otherwise, the encounter does not meet what we believe to be the goals of the provision—to enable more appropriate use of the benefit while also improving the physician's ability to manage the patient's care.

75 Fed. Reg. 70429. Documentation that did not include a description of a physician's clinical findings or link those findings to the patient's homebound status would necessarily provide HHS with less assurance that "the meeting [was] directed to . . . determining whether home health care services are needed." Defs.' Mot. Summ. J. 10. Indeed, during promulgation of the rule, HHS explained that allowing for "standard language which the physician would then simply sign . . . would not achieve the sort of physician involvement in the eligibility determination and care plan which was the Congress'[s] intent." 75 Fed. Reg. 70431. HHS could have required only a physician's mere attestation that she had the type of face-to-face encounter required by the ACA, as HHS now acknowledges, Defs.' Mot. Summ. J. 10, but it rationally chose to require a more comprehensive form of documentation to achieve the statute's goals.

NAHC nevertheless contends that the *outcome* of HHS's rule was "absurd, irrational, and unreasonable," making the rule itself "arbitrary and capricious." Pl.'s Mem. Supp. Mot. Summ. J.

15

18. In NAHC's view, the narrative requirement is unreasonable because it goes against the broader purpose of the overall Medicare statute by "depriv[ing] those who met the standards of their duly entitled benefits." Pl.'s Reply 10.  HHS did acknowledge the concerns of some commenters "that the face-to-face encounter requirements would delay and decrease access to [home health] services," 75 Fed. Reg. 70427, but NAHC believes these commenters' dire predictions have in fact come to pass.  It contends that benefit payments have been denied "to individuals who are homebound and in need of skilled care because of the choice of words, grammar, or sentence structure used by a physician in composing the narrative required under the rule." Pl.'s Reply 8. Setting aside the fact that NAHC cites to allegations contained only in its complaint, NAHC's objection fails because there is nothing in the rule that allows for denials simply because of poor word choice, grammar, or sentence structure.  The rule allows for denials on the basis of inadequate documentation only when, in substance, a physician has not described her clinical findings from the encounter and offered an explanation as to how those findings support that the patient is homebound and in need of home-health services.

Even if NAHC is correct that the rule and its implementation have led to more claim denials than would be optimal from a policy perspective, this fact does not establish that HHS's interpretation of Congress's directive was unreasonable.  To be sure, HHS eventually recognized the need to "simplify the face-to-face encounter regulations" and ultimately decided to eliminate the narrative requirement altogether, 79 Fed. Reg. 66043, but this subsequent action does not undermine the conclusion that HHS "reasonably explained," Pharm. Research & Mfrs. of Am., 790 F.3d at 208, its imposition of the narrative requirement in the first place.  While it is likely that HHS did not foresee in 2011 the degree to which "physicians and HHAs [would] unintentionally fail to comply with certification requirements," id., and might well not have promulgated the narrative requirement had it known the confusion that would result, HHS nonetheless explained at the time it

16

issued the rule why requiring an explanatory narrative was a reasonable interpretation of Congress's directive that "the physician must document that the physician . . . has had a face-to-face encounter" with the patient within a reasonable timeframe. 42 U.S.C. § 1395f(a)(2)(C). In light of Congress's desire to reduce waste, fraud, and abuse—as well as the deference that this Court owes to the agency at step two of the Chevron inquiry—HHS's interpretation was reasonable.

Finally, it is important to note that this Court's analysis would look very different if the rule allowed a Medicare claim reviewer to second-guess the medical judgment of a patient's physician. For instance, if the rule authorized a reviewer to deny a claim—on the basis of insufficient documentation—simply because she disagreed with the physician's clinical findings or the physician's reasoning for why those clinical findings support a need for home-health services, that would go far beyond what the statute allows. HHS's interpretive authority is limited to determining, within reason, how physicians should document that an appropriate face-to-face encounter actually took place—that is, that an encounter occurred that truly focused on determining whether a patient qualifies for home-health services. In making that determination, HHS chose to require physicians to describe their clinical findings and explain why those findings support the need for home-health services. In the Court's view, the rule requires *only* that. To the extent HHS may have veered from that requirement in practice, home-care organizations that have been denied reimbursement on the basis of insufficient documentation are free to contest HHS's implementation of its rule on a case-by-case basis. But the rule itself—which, as HHS has explained, clearly furthers the statutory purpose of reducing waste, fraud, and abuse—reflects a permissible construction of a statute that "is silent or ambiguous with respect to the specific issue" of documentation. Chevron, 467 U.S. at 843. The rule therefore survives step two of the Court's Chevron analysis.

B.     Alternative Sources of Authority – Sections 1395*l*(e) and 1395(g)

HHS also maintains that, even if the narrative requirement were inconsistent with the ACA, the regulation should still be upheld as an exercise of the agency's broad delegation of authority to issue regulations concerning documentation for Medicare reimbursement. That authority includes requiring providers to submit "such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period." 42 U.S.C. § 1395*l*(e); see also 42 U.S.C. § 1395g(a) ("[N]o such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider."); Defs.' Mot. Summ. J. 15. NAHC responds that because a specific authorization prevails over a general one, HHS cannot rely on the broader grant of authority to uphold the narrative requirement. NAHC contends that Section 1395f(a)(2)(C) provides specific and limited authority to promulgate regulations regarding documentation, and that HHS has exceeded that authority here. Moreover, NAHC observes that HHS did not rely either on Section 1395*l*(e) or on Section 1395g(a) at any point in the rulemaking process. 75 Fed. Reg. 43236; Pl.'s Reply 14.

Indeed, HHS did not in fact include these alternative provisions as a basis for authority in the regulation itself. See 42 C.F.R. § 424.22 (citing only 42 U.S.C. §§ 1302, 1395hh (providing for general rulemaking authority)). Both in the proposed and final version of the rule, HHS justified promulgating the rule solely as a means of implementing the statute's face-to-face encounter requirement. See 75 Fed. Reg. 70431; 75 Fed. Reg. 43266–68. Courts "give no deference to agency 'litigating positions' raised for the first time on judicial review" and consider "only the rationales [an agency] actually offered in its decision." Vill. of Barrington, 636 F. 3d at 660 (D.C. Cir. 2011) (citing AT&T Corp., 525 U.S. at 388 (1999)); see also Bowen v. Georgetown Univ.

Hosp., 488 U.S. 204, 212 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). Because HHS did not explain in its proposal or issuance of the final rule that it was relying on the Secretary's authority to request information pursuant to 1395$l$(e) or 1395g(a), it cannot rely on those provisions now to justify the regulation. Therefore, the only permissible basis for the narrative requirement that HHS has imposed here is the Affordable Care Act.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment. An appropriate Order accompanies this Memorandum Opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date:   November 3, 2015